UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTOPHER G. LEWIS, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:18-cv-00705-JMS-DLP |
| TALBOT, | ) |
| Defendant. | ) |

**Order Denying Defendant's Motion for Summary Judgment,
Denying Plaintiff's Motion for Sanctions, and Directing Further Proceedings**

Plaintiff Christopher Lewis is currently incarcerated at Miami Correctional Facility. This action concerns the level of care Mr. Lewis received while he was incarcerated at Pendleton Correctional Facility ("PCF"). Mr. Lewis alleges that defendant Dr. Talbot was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Specifically, Mr. Lewis challenges the medical care and treatment he received related to complaints of nerve damage in his left hand.

### I. Defendant's Motion for Summary Judgment

Dr. Talbot seeks resolution of the claims alleged against him through summary judgment. He argues that Mr. Lewis's constitutional rights were not violated. Mr. Lewis has responded in opposition to the motion for summary judgment, Dr. Talbot has filed a reply, and Mr. Lewis has filed a sur-reply. For the reasons explained below, Dr. Talbot's motion for summary judgment is denied.

**A. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Finally, although *pro se* filings are construed liberally, *pro se* litigants such as Mr. Spears are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

### B. Statement of Facts

As the result of a medical event on March 28, 2017, Mr. Lewis was transported from his cell to the medical unit at PCF. Dkt. 85-2 at 2. While in the medical unit, he was handcuffed to a hospital bed. Dkt. 1 at 7. The next day, March 29, an examination of Mr. Lewis showed no medical issues except for a small laceration above his left eye, and he was released from the medical unit. Dkt. 85-2 at 6-11.[1]

Mr. Lewis submitted a Request for Health Care ("RFHC") on March 31, 2017, complaining that his hand was still numb as a result of the handcuffs being too tight during his time at the medical unit. Dkt. 85-2 at 16. A nurse met with Mr. Lewis on April 4, 2017, and he explained that it felt like pins were sticking two of his fingers whenever he rubbed a specific area on his left hand. Dkt. 85-2 at 17-19. Although the nurse found that Mr. Lewis's left hand had a normal range of motion, no swelling, and no signs of infection, she referred him to the doctor as he requested. *Id.*

Mr. Lewis met with Dr. Talbot on April 10, 2017. Dkt. 85-2 at 20-22. Dr. Talbot's notes from the appointment indicate that he found no signs of injury after examining Mr. Lewis's hands and that Mr. Lewis did not want pain medication. *Id.*

---

[1] Mr. Lewis submitted copies of his medical records when he filed his response in opposition to the motion for summary judgment. *See* dkt. 117-2. The records submitted by Mr. Lewis are identical to the records designated by Dr. Talbot to the extent they contain the same documents. Insofar as the documents overlap, the Court will refer to the medical records designated by Dr. Talbot for ease of reference.

Mr. Lewis submitted another RFHC on May 8, 2017. Dkt. 85-2 at 23. He reported that his left hand was still numb and that it was getting worse. *Id.* He saw a nurse on May 20, 2017, and another examination of his left hand showed no injuries. Dkt. 85-2 at 26-27. The nurse nonetheless referred Mr. Lewis to Dr. Talbot. *Id.* Dr. Talbot saw Mr. Lewis on June 5, 2017, and found no objective evidence of pain. Dkt. 85-2 at 28-30. However, Dr. Talbot decided to prescribe Pamelor to treat Mr. Lewis's pain. *Id.* Although Pamelor is a tricyclic antidepressant, it can be used treat chronic pain, including neuropathy. Dkt. 85-1 at ¶ 10; *see also* dkt. 117-4.

Mr. Lewis submitted another RFHC on July 16, 2017, and he stated the Pamelor was not providing any relief. Dkt. 85-2 at 31. Consequently, Dr. Talbot met with Mr. Lewis on July 19, 2017. Dkt. 85-2 at 32-34. Dr. Talbot's examination again showed no objective hand pain, but he increased Mr. Lewis's dosage of Pamelor. *Id.*

When Mr. Lewis's prescription for Pamelor ran out, he submitted a RFHC asking to see Dr. Talbot. Dkt. 85-2 at 35. Specifically, Mr. Lewis stated in this RFHC that his prescription for Pamelor had run out and his hand was still numb. *Id.* He asked to see a medical provider. *Id.* After a referral from a nurse, dkt. 85-2 at 36, Mr. Lewis saw Dr. Talbot on October 4, 2017. Dkt. 85-2 at 37-39. Although Dr. Talbot states that he has no independent recollection of this appointment, dkt. 85-1 at ¶ 13, the medical record states that Mr. Lewis reported that his symptoms had resolved, dkt. 85-2 at 37-39. Thus, Dr. Talbot concluded there was no need for medication, and he advised Mr. Lewis that he could get pain medication from commissary as needed. *Id.*

On October 14, 2017, Mr. Lewis submitted another RFHC. Dkt. 85-2 at 40. He claimed that Dr. Talbot had discontinued treatment, and Mr. Lewis asked to see a nurse practitioner for a second opinion. *Id.* The response to this RFHC was that Mr. Lewis needed to buy medication from commissary. *Id.* Mr. Lewis completed yet another RFHC on October 31, 2017. Dkt. 85-2 at 41.

He requested an explanation as to why his treatment had stopped and asked for a referral to a specialist. *Id.*

Mr. Lewis met with Dr. Talbot on November 13, 2017. Dkt. 85-2 at 42-44. Dr. Talbot noted that there was no sign of injury to Mr. Lewis's hand, that the results of an examination were normal, that Mr. Lewis had no functional limitations, and that Mr. Lewis could complete normal activities of daily living. *Id.* Thus, Dr. Talbot determined there was no indication for pain medication, but he enrolled Mr. Lewis in the chronic care program for re-evaluation in six months. *Id.*; *see also* dkt. 85-1 at ¶ 14.

On February 5, 2018, almost three months after his last appointment with Dr. Talbot, Mr. Lewis submitted a RFHC complaining that he was experiencing a "burning feeling" and a "shooting pain" in his forearm and the inside of his elbow. Dkt. 85-2 at 45. He met with Nurse Practitioner Wambui Murage on February 9, 2018. Dkt. 85-2 at 48-51. Nurse Practitioner Murage found no abnormalities during her examination, and she explained to Mr. Lewis that the results of her examination did not correlate with his reported symptoms and it was unclear why he was experiencing numbness and pain. *Id.* She concluded that no treatment was needed, but she ordered an x-ray to rule out "any pathology that could be contributing to his problem." *Id.* at 50. Nurse Practitioner Murage noted that Mr. Lewis did not want pain medication; he wanted to know what was wrong with his hand. *Id.* She also noted that he agreed to "wait and see" if more symptoms started to help with treatment of the issue. *Id.*

Dr. Talbot met with Mr. Lewis on May 11, 2018. Dkt. 85-2 at 53-56. Upon examination, he determined that Mr. Lewis's hand was normal, that there was no functional limitation, and that Mr. Lewis continued to work as "dorm detail." *Id.* Dr. Talbot also reviewed the results of the x-ray of Mr. Lewis's hand which showed no issues. *Id.*; *see also* dkt. 85-2 at 52. He advised that Mr.

Lewis could obtain pain medication from commissary. Dkt. 85-2 at 56. This was the last interaction between Mr. Lewis and Dr. Talbot. Dkt. 85-1 at ¶ 17. Mr. Lewis was transferred to another facility in August 2018. *Id.*

**C. Analysis**

Mr. Lewis asserts that Dr. Talbot failed to provide adequate treatment for the nerve damage in his left hand. Dkt. 1 at 7-8. Because Mr. Lewis was incarcerated during all relevant periods, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc).

For purposes of summary judgment only, Dr. Talbot concedes that the injury to Mr. Lewis's hand is an objectively serious medical condition. Thus, only the second element is at issue for Mr. Lewis's claim against Dr. Talbot—whether he was deliberately indifferent to those serious medical conditions.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety." *Whiting*, 839 F.3d at 662 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a subjective test: "[t]he defendant must know of facts from

6

which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728.

The Seventh Circuit has recently recognized that "[p]atients are often the best source of information about their medical condition." *Goodloe v. Sood*, --- F.3d ---, 2020 WL 255318, *1 (7th Cir. 2020). Consequently, "[a] physician's decision to persist with ineffective treatment and ignore a patient's repeated complaints of unresolved pain and other symptoms can give rise to liability—or, at the very least, raise enough questions to warrant a jury trial." *Id.* That is the case here.

Mr. Lewis notified medical staff at PCF of numbness in his left hand in late March 2017. From then until July 2017, Dr. Talbot evaluated Mr. Lewis's hand, prescribed the pain medication Pamelor to treat the symptoms of superficial radial nerve neuropathy, and increased the dosage of Pamelor when Mr. Lewis continued to complain of numbness.

However, in October 2017, after Mr. Lewis submitted a RFHC in which he stated his left hand was still numb, Dr. Talbot concluded that no prescription for pain medication was necessary and directed Mr. Lewis to purchase medication from commissary. Interestingly, the medical record from the October 4, 2017, appointment states that Mr. Lewis's symptoms were resolved even though Mr. Lewis stated in his RFHC that his left hand was still numb.

When Mr. Lewis submitted additional RFHC forms stating the numbness in his left hand persisted, questioning why treatment had stopped, and asking for a referral to a specialist, Dr. Talbot refused to send Mr. Lewis to a specialist. Rather, he elected to enroll Mr. Lewis in the chronic care clinic and evaluate his condition in six months. Although Dr. Talbot states in his affidavit that superficial radial nerve neuropathy "generally resolves on its own after several months" and "conservative treatment is the safest option," dkt. 85-1 at ¶ 14; *see also* dkt. 133 at

7

19 (affidavit of Dr. Carl Kuenzli), he does not acknowledge that the numbness in Mr. Lewis's left hand had persisted for at least six months at that point and the conservative treatment Dr. Talbot had tried was not effective.

Additionally, even though Dr. Talbot repeatedly saw no signs of objective pain on examination of Mr. Lewis's left hand, he took no action to address Mr. Lewis's subjective complaints. Evidence submitted by Dr. Talbot suggests that trying a different pain medication may have been reasonable. In his affidavit, Dr. Talbot states that "there was no clinical reason to continue with Pamelor or another similar drug" because the Pamelor was not effective. Dkt. 85-1 at ¶ 14. However, in an affidavit submitted by Dr. Talbot, Dr. Kuenzli states that Pamelor and Cymbalta can both be used to manage peripheral neuropathy. Dkt. 133 at 19. Although one is not better than the other, due to genetic differences, Cymbalta or Pamelor may work well for one patient and not another. *Id.* This evidence could support a conclusion that Dr. Talbot should have prescribed Cymbalta as an attempt to treat Mr. Lewis's subjective complaints of numbness in his left hand rather than discontinue treatment entirely.

Based on this evidence—which must be construed in the light most favorable to Mr. Lewis as the non-moving party, *Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 214)—a reasonable jury could conclude that Dr. Talbot's decisions to withhold an alternative pain medication when he knew the Pamelor was ineffective and to discontinue treating Mr. Lewis's complaints of numbness in his left hand in October and November 2017 amounted to deliberate indifference. Consequently, Dr. Talbot's motion for summary judgment is denied.

## II. Plaintiff's Motion for Sanctions

As part of the summary judgment proceedings, Mr. Lewis filed a motion for sanctions, arguing that Dr. Talbot's affidavit and Dr. Kuenzli's affidavit were submitted in bad faith. Dkt.

8

125. Under Federal Rule of Civil Procedure 56(h), the Court may order a party to pay "reasonable expenses" another party incurred as a result of the party's submission of an affidavit in bad faith or solely for delay. Fed. R. Civ. P. 56(h).

The Court has already concluded that the affidavit of Dr. Talbot was not submitted in bad faith. *See* dkt. 100; dkt. 111. With respect to Dr. Kuenzli's affidavit, defense counsel submitted an explanation of how the mistake in Dr. Kuenzli's first affidavit occurred. Dkt. 131 at ¶ 4. The explanation provided by defense counsel demonstrates an honest mistake, and defense counsel acted swiftly to withdraw the erroneous affidavit upon realizing the mistake. *See* dkt. 129. Mr. Lewis has not replied in support of his motion for sanctions or otherwise disputed the explanation provided by defense counsel. Thus, the Court concludes that the affidavit of Dr. Kuenzli was not submitted in bad faith.

Because neither Dr. Talbot's affidavit nor Dr. Kuenzli's affidavit was submitted in bad faith, Mr. Lewis's motion for sanctions, dkt. [125], is **denied**.

### III. Conclusion

Dr. Talbot's motion for summary judgment, dkt. [83], is **denied**. This case will be resolved via settlement or trial. It is the Court's preference that counsel represent Mr. Lewis for purposes of settlement and trial. Thus, the Court will again attempt to recruit counsel to represent Mr. Lewis. *See* dkt. 34; dkt. 36. Mr. Lewis shall have **through February 21, 2020,** to notify the Court if he wishes to proceed *pro se* rather than with the assistance of counsel.

Mr. Lewis's motion for sanctions, dkt. [125], is **denied**.

**IT IS SO ORDERED.**

Date: 2/4/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

CHRISTOPHER G. LEWIS
994548
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Stephen C. Keller
SCHILLER BARNES & MALONEY, PLLC
skeller@sbmkylaw.com